# In The United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

HUMANE SOCIETY OF THE UNITED STATES, *ET AL.*,
PLAINTIFFS-APPELLEES,

*v.*

S.M.R. JEWELL, *ET AL.*,
DEFENDANTS-APPELLANTS.

———

On Appeal from the U.S. District Court for the District of Columbia

———

## REPLY BRIEF OF THE STATE OF WISCONSIN AND WISCONSIN DEPARTMENT OF NATURAL RESOURCES

———

BRAD D. SCHIMEL
Attorney General

State of Wisconsin
Department of Justice
17 West Main Street
Madison, Wisconsin 53703
*walshrj@doj.state.wi.us*
(608) 267-1332

RYAN J. WALSH*
Chief Deputy Solicitor General

DANIEL P. LENNINGTON
Deputy Solicitor General

*Admission Pending

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..........................................................................ii

GLOSSARY ...........................................................................................iv

INTRODUCTION....................................................................................1

ARGUMENT .........................................................................................3

    I.    The Agency Correctly Concluded That Wisconsin Has Protected—and Will Continue to Protect—Its Gray Wolf Population....................................................................3

    II.    Even if the Agency Violated the APA, Vacating the Rule Was Improper. ............................................................11

CONCLUSION ....................................................................................16

# TABLE OF AUTHORITIES

**Cases**

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) ............................................................. 12

*Humane Soc. of U.S. v. Jewell*,
76 F. Supp. 3d 69 (D.D.C. 2014) ....................................................... 5, 13

*Humane Soc. of U.S. v. Kempthorne*,
579 F. Supp. 2d 7 (D.D.C. 2008) .......................................................... 15

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ............................................................................ 15

*Wisconsin v. Herwig*,
117 N.W.2d 335 (Wis. 1962) .......................................................... 14, 15

**Statutes**

16 U.S.C. § 1531 ................................................................................... 11

16 U.S.C. § 1533 ........................................................................... 4, 6, 11

16 U.S.C. § 1535 ................................................................................... 11

2011 Wisconsin Act 169.......................................................................... 15

Wis. Stat. § 20.370................................................................................. 14

Wis. Stat. § 29.057................................................................................... 9

Wis. Stat. § 29.185................................................................................... 6

Wis. Stat. § 29.885................................................................................. 10

Wis. Stat. § 29.888........................................................................... 13, 14

Wis. Stat. § 29.977................................................................................... 9

Wis. Stat. § 29.981................................................................................... 9

Wis. Stat. § 29.983................................................................................... 9

**Regulations**

50 C.F.R. pt. 80 ........................................................... 14

*76 Fed. Reg. 81,666 (Dec. 28, 2011) ....................... 3, 4, 5, 8, 10

Wis. Admin. Code § NR Emr. 10.145 ............................ 7

Wis. Admin. Code § NR Emr. R. 19.25 ........................ 10

**Constitutional Provisions**

Wis. Const. art. I, § 26 ............................................... 15

* *Authorities upon which we chiefly rely are marked with asterisks.*

# GLOSSARY

| | |
|---|---|
| Act | Endangered Species Act |
| Agency | United States Fish and Wildlife Service |
| APA | Administrative Procedure Act |
| DNR | Wisconsin Department of Natural Resources |
| DPS | Distinct Population Segment |
| Rule | U.S. Fish and Wildlife Service, Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes, 76 Fed. Reg. 81,666 (Dec. 28, 2011) |
| WGL | Western Great Lakes |

## INTRODUCTION

In its opening brief, Wisconsin made three arguments. *First*, the Endangered Species Act authorizes the United States Fish and Wildlife Service to remove the Western Great Lakes Gray Wolf from the federal list of endangered species. *Second*, the record supports the Agency's finding that the gray wolf is neither endangered nor threatened. *Third*, even if this Court were to agree that the Agency's Rule violated the Administrative Procedure Act, then—rather than vacating—it should remand to the Agency, avoiding needless disruption to Wisconsin's recent efforts to protect and control its wolf population. Wis. Br. 8–26.

In response, the Humane Society mostly retreads its claims that the Agency misread the Act and arbitrarily found the gray wolf not endangered. The Agency's reply brief refutes both propositions. In the interest of efficiency, Wisconsin fully adopts and does not repeat the Agency's arguments. FWS Br. 6–36.

But the Humane Society goes further. Venturing beyond the decision below—which found no fault with Wisconsin's gray-wolf management plan—the Humane Society labels the State's plan "inadequate," asserting (without evidence) that it fails to address

threats to the viability of its wolf population. Also contrary to the opinion below, the Humane Society questions the State's commitment to that plan. Finally, it dismisses (with little argument) Wisconsin's view that, at most, the District Court should have remanded the Rule to the Agency.

The Humane Society's arguments fall short. *First*, the Agency rightly found Wisconsin up to the task of protecting its gray wolves—a responsibility it has discharged for over three decades with spectacular success. The Humane Society does not, and cannot, show that gray wolves face greater risk from diseases under continued Wisconsin management, that regulated wolf harvests in Wisconsin threaten the wolf population's "future viability," and that Wisconsin will not enforce its wolf-management plan. *Second*, the Humane Society is wrong that the Rule merits vacatur. No one can seriously dispute that the WGL Gray Wolf has fully recovered. Restoration of the States' plenary powers to manage their wolf populations is, at most, a question of *when*, not *if*. Forcing a needless relisting in the meantime threatens to interrupt nearly three years of Wisconsin's effective administration of its management plan, disrupting its budget, compromising its

responsibility to control its wildlife for the benefit of its citizens, and restricting the hunting rights of its people.

## ARGUMENT

### I. The Agency Correctly Concluded That Wisconsin Has Protected—and Will Continue to Protect—Its Gray Wolf Population.

An American success story in conservation, gray wolves—once approaching extinction—are now, as the Humane Society puts it, "self-sustaining" in seven states, including Wisconsin. The Humane Society of The United States, *FAQs About The Gray Wolf In The United States, http://www.humanesociety.org/animals/wolves/facts/faq_gray_wolf.html.* In 1992, the federal gray-wolf recovery plan called for a population of just 100 wolves for a minimum of five years living apart from the Minnesota population. *Revising the Listing of the Gray Wolf (Canis lupus) in the Western Great Lakes*, 76 Fed. Reg. 81,666, 81,678 (Dec. 28, 2011). Under Wisconsin's management, its wolf population met that goal in 2002 and has continued to expand rapidly, with a population today exceeding 700. 76 Fed. Reg. 81,676. Between 2004 and 2010, Wisconsin's wolf pack experienced 11-percent growth each year.

76 Fed. Reg. 81,678. Thanks to Wisconsin's efforts, its wolf population today is over *seven times* the federal goal.

The Humane Society does not contest these numbers. It has no quarrel with the Agency's population recovery goal of 100 wolves for Wisconsin, and it does not dispute the population counts. Nor does it challenge the propriety of Wisconsin's minimum management goal of 350 wolves, which is more than three times the federal standard for recovery. AR941–42.

Even so, the Humane Society asserted below that the Agency should have concluded that Wisconsin's gray-wolf management plan is "inadequate," a factor relevant to the listing (or not) of a species, subspecies, or a distinct population segment under the Act, 16 U.S.C. § 1533(a)(1)(D). Dkt. 24-1:40–43. The District Court was not convinced. Although it faulted the Agency for allegedly failing to consider the "absence of any regulations" protecting wolves in the WGL States *other than* Michigan, Minnesota, and Wisconsin, and to explain why Minnesota's hunting rules did not threaten its wolves, the Court identified not a single problem with the Agency's "detail[ed]" review of

Wisconsin's management plan. Nor did the court question the State's commitment to enforcing that plan. 76 F. Supp. 3d 69, 133–34.

Undeterred, the Humane Society raises three bald objections to Wisconsin's wolf management on appeal. None has merit.

**A.** It asserts (albeit only implicitly and in a single sentence) that state management will subject gray wolves to greater risks from "new diseases." Appellees' Br. 30. Yet it makes no attempt to develop the point. For instance, it fails to justify its assumption that the risk of disease threatens not only individual wolves but the viability of the *entire population*—an assumption at odds with the expert Agency's conclusion that, although "disease . . . can temporarily impact population stability, as long as populations are managed above recovery levels," this factor is "not likely to threaten the wolf population at any point in the foreseeable future." 76 Fed. Reg. 81,722.

More fundamentally, the Humane Society fails to explain why it assumes that delisting will materially *change* how gray-wolf disease activity in Wisconsin is controlled. Before delisting, Wisconsin had adopted and administered its own plan for protecting its wolves from disease. 76 Fed. Reg. 81,682, 81,695–698; AR173; AR250. And, under

its management, the wolf population has grown. 76 Fed. Reg. 81,676. Delisting will change little: the State will continue to carry out its plan to protect wolves from disease, subject to Agency monitoring for five years, 16 U.S.C. § 1533(g). *See* Wis. Stat. § 29.185(1m). The Humane Society gives no reason to suppose that the State's efforts, plainly effective over the last three decades, will be any less effective in the decades to come.

In any event, a quick review of the disease-monitoring protocol in Wisconsin's post-delisting management regime should remove all doubt: the plan commits the State's Department of Natural Resources to routine live-trapping of wolves to be "tested for diseases, physiological condition and parasites." AR240. It also requires the DNR to "continue to examine dead wolves" to determine "cause of death, physical condition and disease status," and provides that "[w]olf health monitoring [will] continue to be part of the capture protocol of studies of wild wolves in Wisconsin." AR240. The DNR must use the data it collects, including data concerning disease-related threats, to "limit the number of . . . wolves that may be taken." Wis. Stat. § 29.185(1m); *see*

*also* Wis. Admin. Code § NR Emr. 10.145(1m).[1]  The DNR also has flexibility to adjust annual harvest limits so that it can respond to any "unintended population decline[s]" or "unanticipated change[s]" in mortality rates.  Dkt. 29-4:3–4.  These are hardly the characteristics of a plan that increases the risk of disease-related mortality, let alone one that threatens the entire population's viability.

**B.**  Next, the Humane Society states that the Agency ignored a "known and obvious" inadequacy in Wisconsin's plan: that, "upon delisting, the hunting, and other legal killing, of wolves" will cause a "significant reduction" in Wisconsin's wolf population.  Appellees' Br. 69–70.  Because of a one-year decline in Wisconsin's gray-wolf population after its 2013 hunting season, the Humane Society concludes that wolf hunting in the state "threatens" the animal's "future viability."  Appellees' Br. 70.

The argument founders for at least three reasons.  *First*, the Humane Society is simply incorrect: the Agency *did* address hunting and lethal control, finding that Wisconsin's "laws, plans, and

---

[1] This rule is available at http://docs.legis.wisconsin.gov/code/misc/old/emr1210 _rule_text/emr1210_rule_text.pdf.

regulations . . . adequately regulate human-caused mortality." 76 Fed. Reg. 81,721. As the Agency explained, the "DNR is committed to maintaining a wolf population" of at least "350 wolves," and "[n]o harvest would be considered if the wolf population fell below this goal," except "on limited portions of the wolf range to reduce wolf-human conflict." *Id.* at 81,709–710. The Agency took further comfort in "the fact that the Wisconsin Plan calls for State relisting of the wolf as a threatened species if the population falls to fewer than 250 for 3 years," providing "a strong assurance that any future public harvest is not likely to threaten the persistence of the population." 76 Fed. Reg. 81,710. The Agency therefore concluded "that any public harvest plan would continue to maintain the State wolf population well above the recovery goal of 200 wolves in late winter." *Id.*

*Second*, the Agency was right to reach this conclusion. Beyond the safeguards just described, Wisconsin's plan also calls for a number of specific "delisting regulations" on wolf harvesting designed to secure the population's continued viability. AR179–180. One would impose a substantial fine on, and revoke the hunting license of, any hunter who took a wolf illegally. Another would make the gray wolf "a protected

wild animal" in Wisconsin, which would provide additional penalties for the unlawful killing, wounding, catching, taking, trapping, or possessing of gray wolves. AR179–180. A third rule would forbid disturbing wolf dens. AR180. Additionally, the plan calls for a committee of specialists to meet annually to oversee wolf management in the state. *Id.*[2] These and other aspects of the plan explain the Agency's confidence in Wisconsin's management.

*Third*, even on its own terms, the allegation of a population-wide "threat" falls short. The Humane Society contends that risk to viability is "prove[n]" by the fact that Wisconsin's 2013 hunting season caused its wolf population to decline. Appellees' Br. 69–70. But that fact shows only that hunting has caused—and, in other years, could cause—annual drops in population. It does not prove a threat to the viability of Wisconsin's wolves.

No such threat is otherwise apparent. Between delisting and the District Court's decision, Wisconsin held three wolf-hunting seasons: 2012 (117 wolves harvested); 2013 (257 wolves harvested); and 2014

---

[2] Many of these proposals have, in fact, been enacted into law. *See, e.g.,* Wis. Stat. §§ 29.057, .977, .981, .983.

(154 wolves harvested).[3]  Yet, Wisconsin's wolf population today exceeds 700.[4]  What is more, wolf-population modeling projects that even if Wisconsin continued hunting at the same rate for 20 years, its wolf population would still be 595—nearly six times the federal recovery level.  Dkt. 29-4, ¶ 10.  Managed hunting seasons do not threaten the gray wolf's existence in Wisconsin.

Likewise, the use of lethal means to prevent depredation of cattle and pets poses no threat to the wolf's viability.  Wis. Stat. § 29.885; Wis. Admin. Code § NR Emr. R. 19.25(a).[5]  The Agency determined that Wisconsin's lethal-control program "will not adversely impact the viability of the Wisconsin wolf population."  76 Fed. Reg. 81,708.  The Humane Society gives no reason to unsettle this finding.

**C.**  Finally, the Humane Society speculates that the States, including Wisconsin, might not "enforce their wolf management plans."

---

[3] Some statistics available at Dkt. 29-4 (McFarland Aff.).  Full reports of the 2012, 2013, and 2014 wolf-hunt seasons are generally available at http://dnr.wi.gov/topic/hunt/wolf.html.

[4] Latest population numbers are available at DNR, Wisconsin Gray Wolf Monitoring Report, April 15, 2014 Through April 14, 2015, http://dnr.wi.gov/topic/Wildlife habitat/wolf/documents/PostDelistMonitor2015.pdf.

[5] This rule is available at page 19 of the following document: http://docs.legis.wisconsin.gov/code/misc/old/emr/emr1210_rule_text/emr1210_rule_text.pdf.

Appellees' Br. 70–71. That the Humane Society does not bother to identify *a single reason* for its apprehension is reason enough to disregard it. The Act provides for a five-year post-delisting monitoring period during which, if the States falter, the Secretary may take emergency action to protect the gray wolf. 16 U.S.C. § 1533(b)(7) & (g). This provision apparently does not satisfy the Humane Society, but it does not say why.

Perhaps the Humane Society believes the States' conservation efforts to be inherently suspect. If so, it parts ways with the Act, which—far from holding the States in such low regard—declares their role in protecting wildlife to be "key" and requires the Agency to "cooperate to the maximum extent practicable" with them to ensure species' recovery. 16 U.S.C. §§ 1531(a)(5), 1535(a). In Wisconsin, as the numbers indisputably show, that cooperation has paid off.

## II. Even if the Agency Violated the APA, Vacating the Rule Was Improper.

Whether a rule should be vacated, rather than simply remanded, depends on (1) the seriousness of the order's deficiencies and (2) the likely disruptive consequences of vacating the rule. *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir.

1993).  The second factor may be shown by financial consequences, such as having to refund fees.  *Allied–Signal, Inc.*, 988 F.2d at 151.

**A.**  If the Court were to agree with the Humane Society that *in no set of circumstances* may the Agency recognize a DPS that is a subset of an already-listed species, then the first *Allied–Signal* factor would weigh in favor of vacatur.  That is because, under the Humane Society's radical view, the Agency could not "delist recovered populations of the gray wolf *anywhere* until it can delist gray wolves *everywhere*," FWS Opening Br. 32, and the Agency has not indicated that is prepared to delist the entire *canis lupus* species.

But if the Court concludes otherwise, the first factor weighs against vacating the Rule.  No one disputes that the WGL Gray Wolf has recovered well above federal goals, so the Agency surely will be able to justify its actions on remand, should the Court require more explanation.  Wis. Opening Br. 24.  The Humane Society does not seriously respond to this argument, beyond reiterating what it considers to be the Rule's technical errors.  Appellees' Br. 31–68.

**B.**  The second factor also weighs against vacatur.  As the District Court admitted, "the repeated shifts between State and Federal

management of the gray wolf populations in the Midwest is far from ideal and must be frustrating to both the FWS and the affected States." 76 F. Supp. 3d at 137. With the Rule in place between January 2012 and December 2014, Wisconsin managed the species in accord with its citizens' interests. But with the Rule now vacated, Wisconsin's responsible management of its wildlife has been interrupted, adversely affecting its people in several ways.

*First*, losses from wolf depredation exact a disruptive toll on both the public fisc and the people directly. While the gray wolf remains listed, Wisconsin landowners and DNR may not use lethal controls to protect livestock and pets from wolf attacks. And the DNR must compensate those landowners for death or injury caused by wolves to livestock or pets. *See* Wis. Stat. § 29.888. These payments add up: between 1985 and 2013, the DNR paid $1,588,594.36 under this program. Dkt. 29-2:3, 5. Unsurprisingly, the DNR reports that it pays out more when the wolf is listed and lethal controls forbidden. Dkt. 29-2:4. And, conversely, in the period when the wolf was delisted and lethal controls allowed, the number of farms with verified losses decreased, and so did total depredation compensation. Dkt. 29-2:4.

*Second*, and relatedly, vacatur threatens to dry up Wisconsin's main source of revenue for paying wolf-damage claims: wolf-hunting fees. *See* Wis. Stat. §§ 20.370(5)(fv) & 29.888.  That is because, so long as the wolf is federally listed, wolves may not be hunted.  Wis. Stat. § 29.888(1m).  The DNR's use of other funds to pay claims for damages associated with *all* endangered or threatened species is capped at $100,000 per fiscal year.  Wis. Stat. § 20.370(1)(fs).  But for the past several years, wolf-damage payments have exceeded $100,000.[6]  Thus, vacatur exposes Wisconsin to a fiscal shortfall.

*Third*, keeping the gray wolf on the federal endangered list, notwithstanding that its recovery has exceeded all management goals, interferes with Wisconsin's sovereign interest in controlling its own wildlife and burdens its citizens' hunting rights.  Under Wisconsin law, all animals, including wolves, "are owned by the state in its sovereign capacity in trust for the benefit of the people of the state."  *Wisconsin v. Herwig*, 117 N.W.2d 335, 337 (Wis. 1962).  It is well settled that, in this capacity, Wisconsin possesses the authority to manage its wildlife as it

---

[6] Wolf-damage payment summaries are available online.  *See* DNR, Gray Wolf in Wisconsin, http://dnr.wi.gov/topic/wildlifehabitat/wolf/.  The only other potential source of revenue is federal grants under 50 C.F.R. pt. 80, yet the awarding of these grants is subject to the federal government's discretion and thus is not automatic.

sees fit. *See Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976). To that end, "hunting regulations in the interest of conservation may be enacted in the exercise of the [State's] police power." *Herwig*, 117 N.W.2d at 337. And Wisconsin citizens, as the beneficiaries of this wildlife "trust," enjoy a constitutional *right* to hunt, *see* Wis. Const. art. I, § 26, subject only to the State's interest in conservation. Needless federal protection of Wisconsin's gray wolves represses this power of the State and frustrates the rights of its people.

The Humane Society does not contradict Wisconsin's arguments on the second *Allied–Signal* factor. It cites a wolf case from 2008 concluding that disruption was not a substantial concern. Appellees' Br. 91–92 (citing *Humane Soc. of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 21 (D.D.C. 2008)). But in *Kempthorne*, less time had elapsed (19 months) between delisting and relisting, and there had been no broad intervening change in law, as there was here. *Kempthorne*, 572 F. Supp. 2d at 8–10; *see* 2011 Wisconsin Act 169. Accordingly, the court concluded that "[l]ittle confusion or inefficiency" would result from reinstating the status quo ante. *Kempthorne*, 572 F. Supp. 2d at 21. Here, by contrast, nearly *three years* passed between delisting and the

lower court's judgment, and, in that time, Wisconsin law has allowed lethal controls and three wolf hunts. The State has grown accustomed to managing its wolf population, and the benefits have redounded to the people.

## CONCLUSION

The judgment of the District Court should be reversed.

Dated: April 26, 2016.

Respectfully submitted,

BRAD D. SCHIMEL
Attorney General

/s/ Ryan J. Walsh
RYAN J. WALSH*
Chief Deputy Solicitor General
*Admission Pending

/s/ Daniel P. Lennington
DANIEL P. LENNINGTON
Deputy Solicitor General

Attorneys for State of Wisconsin

Department of Justice
17 West Main Street
Madison, Wisconsin 53703
(608) 267-1332
(608) 261-7206 (Fax)
walshrj@doj.state.wi.us

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 2,989 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using the 2007 version of Microsoft Word in 14-point Century Schoolbook font.

/s/ Daniel P. Lennington
DANIEL P. LENNINGTON
Deputy Solicitor General

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April 2016, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Daniel P. Lennington     _

DANIEL P. LENNINGTON
Deputy Solicitor General